45529.   CENTRAL OF GEORGIA RAILWAY COMPANY
v. WOOLFOLK CHEMICAL WORKS, LTD.

ARGUED SEPTEMBER 10, 1970—DECIDED OCTOBER 26, 1970—
REHEARING DENIED NOVEMBER 13, 1970—

*Harris, Russell & Watkins, John B. Harris, Jr., George B. Culpepper, Jr.,* for appellant.

*Shoob, McLain & Jessee, C. James Jessee, Jr., Robert E. Lanyon,* for appellee.

EBERHARDT, Judge. ■ Defendant urges as the first point in support of its motion that it did not assume any of the obligations or liabilities of the dissolved corporation and was not its successor or assign under the contracts containing the indemnity agreements. Plaintiff railway does not urge that the indemnity agreement was a covenant running with the land rather than a personal undertaking. See *Atlanta Consol. Street R. Co. v. Jackson,* 108 Ga. 634, 638 (34 SE 184); *Waycross Air-Line R. Co. v. Southern Pine Co.,* 115 Ga. 7, 10 (41 SE 271); *Willcox v. Kehoe,* 124 Ga. 484 (52 SE 896, 4 LRA (NS) 466, 9 AC 437); *Jones v. Brown,* 156 Ga. 452 (2) (119 SE 624); *Grant-Jeter &c. Co. v. American Real Estate Co.,* 159 Ga. 80 (125 SE 73); *Cravey v. Druggists Co-Operative Ice Cream Co.,* 66 Ga. App. 909 (19 SE2d 845); *Goldberg v. Varner,* 72 Ga. App. 673 (34 SE2d 722); *James Talcott, Inc. v. Roy D. Warren Commercial Inc.,* 120 Ga. App. 544 (171 SE2d 907). Where a contract or undertaking is personal, it binds only the original parties and those who may assume the obligation or ratify or adopt the contract, even though the contract contains a provision that it is binding upon the successors and assigns of one of the contracting parties. See, in addition to the above authorities, *Greer v. Pope,* 140 Ga. 743, 747 (79 SE 846); Mitchell

v. Atlas Roofing Mfg. Co., 246 Miss. 280 (149 S2d 298) and authorities cited.

A third person may, of course, assume the obligation expressly in writing, or he may do so by implication where his conduct manifests an intent to become bound. *Greer v. Pope,* 140 Ga. 743, supra; Gregers v. Peterson Ice Cream Co., 158 Cal. App. 2d 746 (323 P2d 572); Walker v. Phillips, 205 Cal. App. 2d 26 (22 Cal. Rptr. 727); McGill v. Baker, 147 Wash. 394 (266 P 138); Corvallis & A. R. Co. v. Portland E. & E. R. Co., 84 Ore. 524 (163 P 1173). In the latter event all the circumstances must be considered, such as the subject matter of the contract, the third person's acts and words, whether he acquiesced in the terms of the contract, performed its obligations, or accepted its benefits. Thus in *Greer v. Pope,* 140 Ga. 743, supra, Pope and Ballard entered into a contract with Greer and others whereby the latter would be accorded a telephone line and connections with Pope and Ballard's telephone exchange. The contract was declared to be "binding upon the assigns and heirs of [Pope and Ballard], so that the same shall be operated against all persons holding under them." P. 744. Pope and Ballard then "incorporated their telephone interests" into the Monticello Telephone Company, and that company subsequently sold and transferred its property to Southern Bell which took with notice of the prior contract. Greer and others then sued Pope and Ballard, the Monticello Telephone Company, and Southern Bell seeking specific performance or, in the alternative, damages for breach of the contract for failure to render service in making telephone connections. As to the Monticello Telephone Company, while the evidence was "very meager," the Supreme Court held that "there was enough to authorize the jury to infer that the company assumed the obligations of Pope and Ballard to the plaintiff." P. 749. This evidence consisted of an admission in the pleadings that Pope and Ballard, after incorporating, accepted and transacted business according to the prior agreement, and testimony to the effect that the corporation continued to perform the contract until the business was sold to Southern Bell. As to Southern Bell, the Supreme Court held that the evidence was not sufficient to show that it had become bound to perform the contract by assuming its obligations, the evidence showing only that it had notice of the contract when it purchased the business and that it performed under it for two

months when it discontinued the telephone service.

Similarly, in Gregers v. Peterson Ice Cream Co., 158 Cal. App. 2d 746, supra, a distributor and producer of dairy products entered into a contract whereby the producer was obligated to supply, and the distributor to buy, products at fixed prices. The producer then sold its going business to a third party "free from all liabilities and encumbrances," and the contract was not specifically assigned by the producer to its successor in the business. The agreement and bill of sale of the business provided that the producer would no longer engage in the business being sold. One month after the sale the producer's successor attempted to bill the distributor at a new price, and the distributor sought a declaratory judgment that the successor had assumed the producer's obligation to supply the products at fixed prices. The California court held that the evidence supported the lower court's finding that it was the intention of the parties that the contract was to be assigned to the successor and that the latter had agreed to assume its obligations. In support of its holding the court recited, inter alia, evidence that the successor negotiated with the producer to purchase its going business and to hold its customers and accounts and knew, or ought to have known, of the distributor's contract; that the successor had performed other contracts of its predecessor in business which were also not specifically assigned; that the successor performed the distributor's contract for one month after purchase of the business; that the office manager of the producer stayed on as manager for the successor; that it had become impossible for the producer to perform the distributor's contract because of the non-competition clause in the sales agreement; that the successor had purchased all the assets, personal property, good will, etc., of the producer, which included the distributor's contract; and that, in general, the producer's business was bought and continued to be operated as a going concern. For similar cases see Walker v. Phillips, 205 Cal. App. 2d 26, supra; McGill v. Baker, 147 Wash. 394, supra; Radley v. Smith, 6 Utah 2d 314 (313 P2d 465); Dalton v. Mullins, 293 SW2d 470 (Ct. App. Ky.); Lumsden v. Roth, 138 Cal. App. 2d 172 (291 P2d 88). As a physical precedent regarding a contract providing for indemnity to a railroad for damages occurring on a private sidetrack placed by the railroad on defendant's

premises to serve its business, see *Louisville & N. R. Co. v. Atlantic Co.,* 66 Ga. App. 791 (19 SE2d 364) approving recovery under the indemnity agreement against defendant alleged to be "the successor in title of all the properties formerly held by [the original contracting party] and through a corporate set-up became liable for all of the obligations of the said predecessor in title."

In the instant case defendant argues that the record establishes that it did not receive the assets or assume any of the obligations or liabilities of the dissolved corporation. In support defendant cites the affidavit of William J. Liipfert, III, a former stockholder of the corporation and a partner in Woolfolk Chemical Works, Ltd., who stated that "the records of said Woolfolk Chemical Works, Limited, and of the J. W. Woolfolk Company, show Woolfolk Chemical Works, Limited, did not assume any of the liabilities of the J. W. Woolfolk Company, nor did the J. W. Woolfolk Company convey any of its assets to Woolfolk Chemical Works, Limited."

While the corporation did not make a direct conveyance of its assets to the partnership, it conveyed them to the shareholders in proportion to their stock interests in the corporation, who in turn formed the partnership the following day and continued to operate the business under the same management. As far as can be determined from the record before us, the only change in the business was a pro forma change from corporation to partnership, with the addition of three children of W. J. Liipfert, one of the prior stockholders and a general partner of the limited partnership, their total interest representing what had been Liipfert's stock interest.

The statement that the partnership did not assume any of the liabilities of the corporation is objectionable as a conclusion and must be disregard on motion for summary judgment. *Varnadoe v. State Farm Mut. Auto. Ins. Co.,* 112 Ga. App. 366 (1) (145 SE2d 104); *Benefield v. Malone,* 112 Ga. App. 408 (2) (145 SE2d 732); *Chandler v. Gately,* 119 Ga. App. 513 (1b) (167 SE2d 697). If the statement is taken to mean that there was a written instrument which the witness concluded did not cast liability upon the defendant, the statement is objectionable as a legal conclusion. See, e.g., *Travelers Ins. Co. v. Thornton,* 119 Ga. 455 (1) (46 SE 678); *Sasser v. Coastal States Life Ins. Co.,* 113 Ga. App. 17, 21 (147 SE2d 5).

If the witness meant that the partnership had not impliedly assumed the obligations of the contract, the statement would be equally objectionable, for, in the absence of a written assumption, the statement would be a conclusion as to the ultimate matter in issue.

There being no other evidence offered to show that the partnership had not assumed the corporation's obligations under the contract, summary judgment could not be granted to defendant on this point. While at the trial the burden would rest upon plaintiff to show that the partnership *had* assumed the obligation, on defendant's motion for summary judgment the burden rests upon defendant to show that it had *not* assumed it. "On motion for summary judgment by a defendant on the ground that plaintiff has no valid claim, the defendant, as the moving party, has the burden of producing evidence, of the necessary certitude, which negatives the opposing party's (plaintiff's) claim. This is true because the burden to show that there is no genuine issue of material fact rests on the party moving for summary judgment, whether he or his opponent would at trial have the burden of proof on the issue concerned; and rests on him whether he is by it required to show the existence or non-existence of facts." 6 Moore's Federal Practice, pp. 2342-2343 (2d Ed. 1966) § 56.15 [3]. Accord: *Colonial Stores v. Turner,* 117 Ga. App. 331, 333 (160 SE2d 672); *Lanier v. Krzywicki,* 118 Ga. App. 54, 55 (162 SE2d 839); *Sanfrantello v. Sears, Roebuck & Co.,* 118 Ga. App. 205, 206 (163 SE2d 256); *Herrington v. Stone Mountain Memorial Assn.,* 119 Ga. App. 658, 661 (168 SE2d 633); *Whisenhunt v. Allen Parker Co.,* 119 Ga. App. 813, 819 (168 SE2d 827); *Wood v. Brunswick Pulp &c. Co.,* 119 Ga. App. 880 (169 SE2d 403); *D. H. Overmyer Co. v. Joe Summers Roofing Co.,* 120 Ga. App. 188, 189 (169 SE2d 821). *Werbin & Tenenbaum, Inc. v. Heard,* 121 Ga. App. 147 (2) (173 SE2d 114), where it was held: "The defendant, having made the motion for summary judgment, must produce evidence which conclusively negates at least one essential element entitling plaintiff to a recovery under every theory fairly drawn from the pleadings and the evidence . . . The grant of a summary judgment may be improper where, at the trial, the grant of a directed verdict may be proper, when the party making the motion

for summary judgment is not required to carry the burden on the trial of the case [citations omitted]."

We conclude that summary judgment can not be granted in this case on defendant's contention that it had not assumed the corporation's contractual obligations to the railway.

We do not overlook the case of *Central of Ga. R. Co. v. Swift & Co.,* 23 Ga. App. 346 (98 SE 256), where there is some similarity in the factual situation. But that case does not require a different result. A careful examination of the record in it discloses that it was not brought on a *contract* of indemnity, as was the case here, but was brought under the theory that the railroad had been guilty of passive negligence only (failure to inspect), while Swift (whom the railroad had vouched into the original suit) had been guilty of active negligence in the faulty construction of a shed over the spur track. That theory had been upheld in *Central of Ga. R. Co. v. Macon R. &c. Co.,* 140 Ga. 309 (78 SE 931), and there was reliance on that case. See also *Charleston & W. C. R. Co. v. Union Warehouse &c. Co.,* 139 Ga. 20 (76 SE 360); *McArthor v. Ogletree,* 4 Ga. App. 429 (61 SE 859), and *Byne v. Mayor &c. of Americus,* 6 Ga. App. 48 (64 SE 285). But we held in the *Swift* case that the negligence charged and upon which there had been a recovery against the railroad "did not amount to mere legal, passive acquiescence in the negligence of" Swift, but was "such active, positive, and negligent conduct on the part of the railroad company [as] amounted to an actual participation by it in the proximate cause of the homicide."

In this case the railroad does not rely upon that theory or principle of law which was laid down in *Central R. Co. v. Macon R. &c. Co.,* 140 Ga. 309, supra, but relies and declares upon its contract of indemnity with Woolfolk, the validity and binding effect of which has been recognized in many cases. See *Blitch v. Central of Ga. R. Co.,* 122 Ga. 711 (50 SE 945); *Hearn v. Central of Ga. R. Co.,* 22 Ga. App. 1 (95 SE 368); *Dowman-Dozier Mfg. Co. v. Central of Ga. R. Co.,* 29 Ga. App. 187 (114 SE 815); *Davis v. Gossett & Sons,* 30 Ga. App. 576 (118 SE 773); *Louisville & N. R. Co. v. Atlantic Co.,* 66 Ga. App. 791, supra; *Bohannon v. Southern R. Co.,* 97 Ga. App. 849 (104 SE2d 603).

■ Defendant next argues that whether the railway's complaint

be construed as seeking relief upon written contract, implied contract, or covenant restricting use of land (i.e., restrictions on structures within a certain distance of the railroad track), the claim is barred by the statute of limitation applicable in each of these instances since suit was not brought until forty-three years after execution of the earliest agreement and twenty-nine years after the execution of the latest.

"The true test of when a cause of action arises or accrues, as used in the statute of limitations, is to ascertain the time when the plaintiff could first have maintained an action to a successful result. [citations omitted]." *Hollingsworth v. Redwine,* 73 Ga. App. 397, 398 (36 SE2d 869). The instant suit is one on the indemnity agreement, and the railway's cause of action accrued and the statute began to run at the time of the consummation of the settlement between it and the employee. 41 AmJur2d 729, Indemnity § 39; McDonald v. Blue Jeans Corp., 183 FSupp. 149 (DC NY). Since it does not appear from the record when the settlement was consummated, defendant has not carried its burden of showing that the claim was barred by the statute of limitation.

■ Defendants' third contention in support of its motion is that the sidetrack agreements were void ab initio as being illegally in restraint of trade and against public policy. The contract provided: "As one of the express conditions hereof and as one of the main considerations moving the railway thereto, the tenant covenants and agrees that it and all others who may be operating said plant or using said track, will route, or cause to be routed, via the lines of the railway and of the Ocean Steamship Company of Savannah (in which the railway is largely interested) or of any other company whose relation to the railway may be similar thereto, all shipments, on or out, of freight made either by, to or for account of the tenant, or occupants, where such shipments are to or from points reached by the lines of the railway or of the Ocean Steamship Company and their connections, their covenant being on the sole condition that lawful and open rates and facilities shall be equal."

*Western Union Tel. Co. v. American Union Tel. Co.,* 65 Ga. 160 (38 AR 781), cited by defendant, does not sustain its contention that the contract is void as against public policy. There a railroad

company attempted to convey to a telegraph company exclusive rights for telegraphic facilities on the railroad's right of way which the railroad had acquired by the exercise of the power of eminent domain and which was thus condemned to public use. The telegraph company was a public utility and not a private concern as in the instant case. The Supreme Court noted, inter alia, that the contract enabled the telegraph company "to fix its tariff of rates at a maximum, governed alone by the necessities of its patrons." None of these considerations is present in the case at bar, and the *Western Union* case is too dissimilar factually to be of service here.

There are, of course, cases holding that a common carrier or public utility, which is bound to afford service to the general public, cannot require a customer to use its services exclusively. See Harding Glass Co. v. Twin City Pipe Line Co., 39 F2d 408 (CA 8), collecting many of these cases. Thus in Gwynn v. Citizens' Telephone Co., 69 S. C. 434 (48 SE 460), it was held that a contract by a telephone company with a customer to put in a telephone on condition that the customer not use another system was void as against public policy. In prior litigation (State ex rel. Gwynn v. Citizens Telephone Co., 61 S. C. 83 (39 SE 257)), it had been held that a telephone company is bound to afford equal facilities to all in similar circumstances under reasonable limitations and without discrimination, and could therefore be compelled, against its will, to supply telephone service to an applicant even though the applicant had previously breached his contract with the company not to use a competitor's line. As the court observed (P. 97): "It seems to us that the respondent [telephone company], after offering to the public its telephone system for the transmission of news, would have no more right to refuse to furnish the relator [applicant] its facilities for the transmission of news unless he would agree not to use the Bell telephone system in operation in the same city, but use exclusively respondent's system, than a railway company would have to refuse to transport the goods of a shipper unless such shipper would agree to patronize its line exclusively, and not give any of its business to any competing railway line."

The situation in the case at bar is not one in which a shipper approaches the railway station for the purpose of shipping goods,

and the railway exacts exclusive patronage as a consideration of shipment. Rather, it is a situation where a private business desires the railway to construct a spur or sidetrack to its establishment over its private property so that more conveniently and economically it may handle its shipments. In the former situation the railway is bound to accept and ship the goods under its duty as a common carrier; but in the latter situation, it is under no obligation to provide the sidetrack. This vital distinction has been recognized in cases where indemnity agreements similar to the one under consideration have been upheld against attacks that they were void because against public policy. As stated in Annot., 20 ALR2d 711, 712: "Contracts under which a railroad company constructs industrial switches, spurs, or sidetracks, to serve industrial plants situated on property owned by others, frequently provide that the railroad is exempted from, or will be indemnified for, loss to persons or property connected with the industry or business to be served by such spur track. The service afforded the shipper by such additional facilities for the special handling of his freight is not normally required of the railroad under its duties to the public as a carrier, and it may attach such conditions as it sees fit in giving its consent to furnish the particular service." Accord: *Davis v. Gossett & Sons,* 30 Ga. App. 576, supra (affd. 158 Ga. 886 (124 SE 529)); *Louisville & N. R. Co. v. Atlantic Co.,* 66 Ga. App. 791, supra. The applicable principle is stated in *Butler v. Tifton, T. & G. R. Co.,* 121 Ga. 817, 820 (49 SE 763): "The public has an interest in the location of depots, and the time and place at which trains must stop for the reception of freight and passengers. A railroad company's power to contract in reference thereto is therefore not unrestricted, but public policy must be considered in determining the legality of such agreements. [citations omitted]. But such limitation on its power to contract does not apply to a case where the railroad company covenants to build a spur-track from its main line to a sawmill or other private enterprise. The interest of the public can not in any way be seriously affected by the construction and maintenance of such track." The Supreme Court in the latter case upheld a suit by a timber merchant against a railroad for breach of a contract to build a sidetrack. Under the contract the railroad agreed to build the sidetrack to a

sawmill and to haul timber therefrom at a rate as low as that charged other shippers in consideration of the merchants' agreement to ship all the lumber cut from the land over the railway company's line. Similar agreements were upheld in Bald Eagle Val. R. Co. v. Nittany Val. R. Co., 171 Pa. 284 (33 A 239) and Cascade Timber Co. v. Northern Pac. R. Co., 28 Wash. 2d 684 (184 P2d 90), and we find no invalidity in the contracts for any reason assigned.

4. Defendant argues finally that the clearance provisions of the contracts were waived by acquiescence and other conduct of the plaintiff, and that plaintiff is now estopped from relying upon them. Assuming, but not deciding, that acquiescence in breach of the clearance provisions would bar an action on the indemnity agreement, we think this peculiarly a jury question, as well as questions relating to passive, active, joint or concurring negligence as between the railway and the partnership.

*Judgment reversed. Jordan, P. J., and Pannell, J., concur.*